**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 22-cr-197 (DLF)** |
| **GEOFFREY SHOUGH,** | |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum. For the reasons set forth herein, the government requests that this Court sentence Geoffrey Shough to a sentence of 11 months' incarceration, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment.

I.     **INTRODUCTION**

Defendant Geoffrey Shough participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.8 million dollars in losses.[1]

Shough, a former Department of Defense contractor, wore tactical gear (including a body armor vest, ballistic-style helmet, and hard-knuckle gloves) to the Capitol, where he cheered from

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

the West Lawn as other rioters assaulted and overran law enforcement officers who were defending the Northwest Steps to the Capitol Building; assisted other rioters (for instance, helping them onto a small wall) as they moved toward the Capitol; forcibly entered the Capitol Building as one of the first individuals in a group that pushed through, violently overwhelmed, and made physical contact with a line of uniformed officers during the second breach of the Senate Wing Door; repeatedly encouraged officers to stand aside; and remained inside the Capitol for approximately 15 minutes, traveling to multiple locations within the building (including walking through the Crypt, past the House Wing Door, through the Hall of Columns, and exiting the South Door).

The government recommends that the Court sentence Shough to 11 months' incarceration, a midpoint sentence within the advisory Guidelines' range of 8-14 months, which the government submits is the correct calculation. A 11-month sentence reflects the gravity of Shough's conduct, but also acknowledges his early admission of guilt.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters, including Shough, unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. Many rioters attacked and injured law enforcement officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day. *See*

*United States v. Mazzocco*, No. 21-cr-54 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

As set forth in the PSR and the Statement of Offense incorporated into Shough's plea agreement, a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol. Members of the House of Representatives and the Senate were meeting in separate chambers to certify the vote count of the Electoral College of the November 3, 2020 Presidential election. By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside. At approximately 2:00 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building. Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting law enforcement officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate,

3

including the President of the Senate, Vice President Pence, were forced to evacuate the chambers. All proceedings, including the joint session, were effectively suspended. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed. *See* Statement of Offense ¶¶ 1-7; PSR ¶¶ 13-19.

### *Injuries and Property Damage Caused by the January 6, 2021 Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell); *United States v. Mazzocco*, 1:21-cr-54 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

In addition, the rioters injured more than a hundred members of law enforcement. *See* Staff of Senate Committees on Homeland Security and Gov. Affairs and on Rules and Admin. Report,

Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc /HSGAC&RulesFullReport_ExaminingU.S.CapitolAttack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers. *See id.* at 27-30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their safety. *See id.*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.8 million dollars.

**B.      Defendant's Role in the January 6, 2021 Attack on the Capitol**

*Approach to the Capitol*

Geoffrey Shough, a former Department of Defense contractor, participated in the January 6 attack on the Capitol. His crimes are documented through cell phone video obtained by federal search warrants, body worn camera footage from the Metropolitan Police Department, open-source video, and surveillance footage from inside of the Capitol.

Shough drove to Washington, D.C. from his home in Austin, Texas on January 2, 2021. Statement of Offense ¶ 8. The purpose of his trip was to protest Congress's certification of the Electoral College. *Id.* at ¶ 9. Shough attended the "Stop the Steal" rally on the Ellipse and then marched with other protestors to the Capitol. *Id.* He wore a jacket that was orange-brown in color over a body armor vest with a Texas flag patch, a ballistic-style helmet with an Oath Keepers decal on the back and American flag on the front, goggles, hard-knuckle gloves, and a tan pouch attached at his hip. *Id.* At approximately 1:50 p.m. on January 6, 2021, Shough stood with a crowd of rioters in a restricted area, the West Lawn of the U.S. Capitol grounds. *Id.* at ¶ 10. He carried and waved a large Texas flag, assisted rioters as they moved closer to the Capitol Building and cheered as other rioters attacked and then overwhelmed police officers nearby on the Northwest Steps. *Id.*



*Figure 1: Shough assisting fellow rioters onto a small wall near the Northwest Steps to the Capitol.*





*Figures 2 and 3: Shough cheering as other rioters climb onto the Northwest Steps after a line of police officers had been overwhelmed and retreated closer to the Capitol Building. Video of this incident will be provided to the Court as Exhibit 1 and can be seen at timestamp 5:02.*

Shough then proceeded to the Northwest Courtyard of the Capitol Grounds. *Id.* at ¶ 11.

Before he reached the Senate Wing Door, he spoke with an individual who recorded the interaction by cell phone. Shough stated,

> This is our Capitol. I told the cops to stand down. We love them. They can't be in the way. I told the cops they need to stand down. We're their brothers and sisters. One said, "I don't feel much love from the crowd." I'm like, "guy, take the day off. This is your neighbors. Your neighbors are here. The laundromat. A teacher. Just go home." I tried to shoo him off. I'm like, "you can't stop a million people. There's a million people coming here! Get out of the way and go home!"

 

*Figures 4 and 5: Shough captured on cell phone video as he proceeds to the Senate Wing Door. Video of this incident will be provided to the Court as Exhibit 2.*

 

*Figures 6 and 7: Shough outside Senate Wing Door.*

8

### *Shough's Entry into the Capitol*

Shough forcibly and unlawfully entered the Capitol Building through the Senate Wing Door at 2:48 p.m. on January 6, 2021. *Id.* at ¶ 12. Shough was among the first few individuals to violently breach and make physical contact with a line of uniformed Capitol Police Officers who were attempting to prevent the rioters from entering the Capitol. *Id.* As the door's alarm blared, Shough and the other rioters physically pushed through the police line, overwhelmed the officers, and entered the U.S. Capitol. *Id.*

 

*Figures 8 and 9: Shough and fellow rioters pushing through a line of U.S. Capitol Police Officers as they breach the Senate Wing Door. Video of this incident will be provided to the Court as Exhibit 3.*

Shough then engaged in an animated conversation with one or more of the Capitol Police Officers before moving further into the U.S. Capitol Building. *Id.* at ¶ 13. Shough told the officers to go home, that they needed to get then-President Donald Trump on the phone, and that they needed to contact a superior officer in order to "get the situation under control." *United States v. Shough*, No. 22-cr-197 (DLF), Hearing 8/16/22.






*Figures 10, 11, and 12: Shough engaged in an animated conversation with a U.S. Capitol Police Officer. Open-source video of the approximate area and time of this incident, in which Shough can be seen, will be provided to the Court as Exhibits 4 and 5 (at 25:00 – 30:15).*

Shough then traveled through the Crypt, past the House Wing Door, through the Hall of Columns, and, at approximately 3:03 p.m., exited the U.S. Capitol through the South Door. Statement of Offense ¶ 14. He was inside the U.S. Capitol Building for approximately 15 minutes. *Id.*





*Figures 13 and 14: Shough proceeding past the House Wing Door and down the Hall of Columns. CCTV video of Shough's unlawful presence in the Capitol will be provided to the Court as Exhibits 6 and 7.*

### III.    THE CHARGES AND PLEA AGREEMENT

On June 1, 2022, a federal grand jury returned an indictment charging Shough with Civil

Disorder in violation of 18 U.S.C. § 231(a)(3), Entering or Remaining in a Restricted Building or

Grounds in violation of 18 U.S.C. §§ 1752(a)(1), Disorderly and Disruptive Conduct in a

Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2), Disorderly Conduct in a

11

Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D), and Parading Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G). On August 16, 2022, the defendant pleaded guilty to Count One, Civil Disorder in violation of 18 U.S.C. § 231(a)(3).

## IV.   STATUTORY PENALTIES

The defendant now has been convicted of Civil Disorder and faces sentencing. As recognized within the Plea Agreement and by the U.S. Probation Office, Shough faces up to five years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years.

## V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

The Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The PSR correctly adopts the Offense Level Computation prepared by the parties in the Plea Agreement. That Guidelines analysis follows:

Count One: 18 U.S.C. § 231(a)(3)

|  |  |  |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1)(A) | Offense Involved Physical Contact | +3 |
|  | **Total** | **13** |
| Acceptance of responsibility (U.S.S.G. § 3E1.1(a)) |  | -2 |

**Total Adjusted Offense Level:**                                             **11**

*See* PSR ¶¶ 33-43; Plea Agreement ¶ 5(A).

The parties agreed that a three-level enhancement under U.S.S.G. § 2A2.4(b)(1)(A) was appropriate because the "offense involved physical conduct." Plea Agreement ¶ 5(A). During his entry through the Senate Wing Door, Shough, or other rioters acting in concert with him, made physical contact with the line of USCP Officers who were defending the Capitol Building. *See, e.g., United States v. Taliaferro,* 211 F.3d 412, 415 (7th Cir. 2000) (interpreting § 2A2.4(b)(1)(A) by comparing to the law of battery, in which "the contact between the aggressor and the victim need not be direct, but rather can result from the 'indirect application of force ... by some substance or agency placed in motion by' the aggressor").

The U.S. Probation Office calculated the defendant's criminal history as Category I, which is not disputed. PSR ¶ 46. Accordingly, based on the agreed-upon calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 11, Shough's Guidelines imprisonment range is 8 to 14 months' imprisonment. The defendant's Plea Agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

Sentencing also is guided by 18 U.S.C. § 3553(a). Some of the statutory factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of a

term of incarceration.

A.      **Nature and Circumstances of the Offense**

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol and assaulted law enforcement on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with law enforcement.

While looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, including: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or

14

contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

To be clear, had the defendant personally engaged in more egregious violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of additional violent or destructive acts on the part of the defendant is therefore not a mitigating factor.

The nature and circumstances of Shough's crimes weigh heavily towards a term of incarceration. Shough's decision to wear tactical gear to the Capitol – a body armor vest purportedly containing Kmart cutting boards, a ballistic-style helmet, goggles, and hard-knuckle gloves – demonstrates that he was prepared for violence. Shough spent significant time on the West Lawn, observing rioters assaulting police officers, assisting rioters climbing the small wall on which he was standing, cheering as they overran the officers, and then himself proceeding through the restricted Capitol Grounds toward the U.S. Capitol Building. Before he made it to the Building itself, Shough already interfered with the law enforcement officers defending the Capitol. He bragged that he, "told the cops to stand down," to "take the day off," "just go home," and "get out of the way and go home." When that was unsuccessful, Shough, wearing his myriad of tactical gear, forced his way inside the Senate Wing Door and, acting in concert with other rioters, violently pushed through a line of police officers. Shough was one of the very first individuals to overrun the U.S. Capitol Police Officers during the second breach of the Senate Wing Door. While an alarm blared and the rioters chanted "traitors" toward the uniformed officers, Shough confronted the outnumbered officers, again pleading with them to "go home." He then marched through the Capitol Building for approximately 15 minutes before the officers regained control and forced the

rioters to leave the Building.

The seriousness of this offense, including the defendant's assistance of other rioters, incitement of the mob violence, forcible entry into the U.S. Capitol during the second breach while dressed for battle, physical contact with officers, and repeated attempts to convince the officers to abandon defense of the Capitol Building, demands a sentence of imprisonment.

### B. The History and Characteristics of the Defendant

The defendant is a former Department of Defense contractor. His criminal history consists of just three traffic violations, for conduct that took place in 2004, 2012, and 2015. He has no other arrests and no criminal convictions.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[2] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Shough's criminal conduct, forcing his way into the U.S. Capitol Building and encouraging officers to abandon its defense, is the epitome of disrespect for the law. When Shough entered the Capitol grounds, the Capitol Building itself, it was abundantly clear to him that lawmakers, and the law enforcement officers who tried to protect them, were under siege. Law enforcement officers were overwhelmed, outnumbered, and in some

---

[2] FBI Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

cases, in serious danger. The rule of law was not only disrespected; it was under attack that day. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that attempts to obstruct official proceedings and assaults on police officers are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.      The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[3] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing in *United States v. Hodgkins*:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay

---

[3]  *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

in the certification. It is a damage that will persist in this country for decades.

*United States v. Hodgkins*, No. 21-cr-188-RDM, Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was [before the attack] for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of incarceration. First, although the defendant has a criminal history category of I, his crime appears to be the product of planning and deliberation. The Texas flag that he carried was purchased on December 16, 2020, just one day before he made a donation to the Oath Keepers for which he was sent the decal on his ballistic helmet. Shough traveled to D.C. days before January 6, 2021, and was girded for battle. He expressed pride in interfering with the officers' defense of the Capitol Building, and was one of the first individuals to violently breach the Senate Wing Door after it had previously been re-secured from its first breach. Shough and other rioters made physical contact with and overwhelmed the officers. At his change-of-plea hearing, Shough first argued

that he "did not enter on his own volition" and "was pushed inside." The defendant's first sign of contrition for his conduct on January 6 appears to have occurred late last month, when Shough provided a written statement to the Probation Office in anticipation of sentencing. *See* PSR ¶ 31. *See United States v. Mazzocco*, 21-cr-54 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan). Even then, Shough blamed his conduct, in part, on being "an unknown pawn in a scheme to fracture our democracy[.]" *Id.* But, as Judge Amy Berman Jackson explained to a January 6 defendant when rejecting a similar defense,

> So, yes, the speakers deliberately repeated the lies and stoked the flames of discontent and encouraged the people at the rally to go to the Capitol and fight for one reason: To make sure the certification did not happen. And while those words may be a part of the context of what happened, or even the inspiration for what happened, they're not an excuse or justification for the choices made by grown men and women who entered the building.
>
> No one was swept away to the Capitol. No one was carried. The rioters were adults. This defendant, like hundreds of others, walked there on his own two feet and he bears responsibility for his own actions. There may be others who bear greater responsibility and who must also be held accountable, but this is not their day in court; it's yours.

*United States v. Sorvisto*, 21-cr-320 (ABJ), Tr. 12/15/2021 at 20-21.

Shough's sentence must be sufficient to provide specific deterrence from committing future crimes, particularly when he appears to blame others for the crime of his conviction.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement

community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

　　　　Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate

sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.   Unwarranted Sentencing Disparities

Finally, the Guidelines direct a court to consider the need to avoid unwarranted sentencing disparities. *See* 18 U.S.C. § 3553(a)(6). Of course, the crimes that the defendant and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other obstruction-related conduct in other cases. To try to mechanically compare other § 231(a)(3) defendants prior to January 6, 2021, would be minimize the magnitude of what the riot entailed and signified.

While no previously sentenced case contains the exact same balance of aggravating and mitigating factors present here, the cases discussed below include some of the same factors as this case. The best comparison for Shough is that of three other individuals with minimal criminal histories who were convicted of Civil Disorder under 18 U.S.C. § 231(a)(3) for their unlawful conduct on January 6, 2021: Moises Romero, Nolan Cooke, and Robert Fairchild, Jr.[4] In each case, as here, the government recommended a sentence of 11 months' imprisonment and three years of supervised release.

---

[4] These three cases serve as the best comparators because, like Shough, each defendant pleaded guilty to one count of 18 U.S.C. § 231(a)(3) and each committed conduct sufficient for application of the three-level § 2A2.4(B)(1)(a) enhancement for an offense involving physical contact.

21

Like Shough, Moises Romero was one of the first few rioters to overrun the Capitol Police officers defending the Senate Wing Door at 2:48 p.m. *See United States v. Romero*, No. 21-cr-677 (TSC), ECF No. 23 at ¶ 11. He breached the Capitol Building alongside Shough and apparently took the same path, exciting the Capitol Building through the South Door at approximately 3:03 p.m. *Id.* at ¶ 12. Like Shough, Romero had no prior criminal history and accepted responsibility relatively soon after his arrest. *See id.*, ECF No. 29 at 37. He brought eye protection and a respirator; like Shough, anticipating violence before he went to D.C. *Id.* at ¶ 36. Although, unlike Shough, Romero apparently did not repeatedly beseech the officers to "go home" and abandon defense of the Capitol from the rioters, Romero's conduct was aggravated because he pushed through a police line at the Lower West Terrace, grabbed a police officer's riot shield as he breached the Senate Wing Door, and entered a senator's private office during his time in the Building. *Id.* at ¶¶ 36-37. Romero took multiple videos of his unlawful presence in the Capitol and put together a composite video that he proudly disseminated through social media. *Id.* at ¶ 37. Romero then tried to enter the Capitol again. *Id.* at 40. To reflect the gravity of Romero's conduct and promote the goal of general deterrence, Judge Chutkan sentenced him to a year and a day of imprisonment and 12 months of supervised release. *Id.*, ECF No. 36.

Nolan Cooke helped lead the charge of rioters who broke through the police line guarding the east side of the Capitol Building. *See United States v. Cooke*, No. 22-cr-52 (RCL), ECF No. 48 at ¶ 9. Cooke later bragged that he was one of the first to break through the barricade. Cooke encouraged other rioters to overrun the police line, yelling obscenities along the way. *Id.* at ¶ 10. Once the rioters had broken through the barricade, Cooke rushed to the Capitol steps and then up to the Building itself. *Id.* at ¶ 11. Cooke used a flagpole bearing an American flag to strike one of

the Capitol windows and encouraged other rioters to "smash the windows" and "break the glass." *Id.* Cooke eventually left the restricted area without entering the building. *Id.* at ¶ 12. Afterwards, Cooke was cooperative with law enforcement officers when they interviewed him. *Id.* at ¶ 14. Judge Lamberth sentenced Cooke to a year and a day of imprisonment, in the middle of Cooke's 8-14 month guidelines range. *Id.*, ECF No. 60.

Robert Fairchild also was convicted of Civil Disorder and faced a Guidelines range of 8 to 14 months of imprisonment. *See United States v. Fairchild*, No. 21-cr-35 (TFH), ECF No. 34. Fairchild stood at the front line of rioters who broke through a police barricade on the west side of the Capitol Building. *Id.*, ECF No. 35 at ¶¶ 9-10. He made multiple attempts to wrest the metal barriers away from a line of law enforcement officers, eventually assisting other rioters carrying at least two barriers away from the line. *Id.* at ¶ 10. Fairchild then entered the Capitol Building through the Senate Wing Door, without force, at approximately 3:10 p.m. and walked through the building for around nine minutes. *Id.* at ¶ 11. Recognizing Fairchild's status as the first defendant to appear before him to express remorse for what January 6 did to the victims, rather than himself, and due to Fairchild's military service and PTSD, Judge Hogan sentenced him to six months of incarceration and no supervised release. *See id.*, ECF No. 46.

Regardless, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its

own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[5] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(3), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted by 18 U.S.C. § 3663(a)(3), that Shough must pay $2,000 in restitution to the Architect of the Capitol, which partially reflects the role Shough played in the January 6 riot.[6] Plea Agreement ¶12. As the

---

[5] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

[6] Unlike under the Sentencing Guidelines for which (as noted above) the government does not

Plea Agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id.* Shough's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶¶ 10, 91, 108.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends a sentence of imprisonment of 11 months' imprisonment, which is a midpoint sentence as calculated by the government and as agreed upon by the parties in the Plea Agreement, three years of supervised release, restitution of $2,000, and the mandatory $100 special assessment for each count of conviction.

Respectfully Submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
DC BAR NO. 481052

By:    */s/ Jordan A. Konig*
JORDAN A. KONIG
Supervisory Trial Attorney,
U.S. Department of Justice
Detailed to the U.S. Attorney's Office
For the District of Columbia
P.O. Box 55, Washington, D.C. 20044
202-305-7917 (v) / 202-514-5238 (f)
Jordan.A.Konig@usdoj.gov

---

qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp. 2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

25